Pamela **WOOD** and **Glenroy Wood, Plaintiffs**

v.

**UNITED STATES of America, Defendant**

No. 99–CV–288–BS.

United States District Court, D. Maine.

June 21, 2001.

to represent defendants.

Francis J. Hallissey, Machias, ME, Ralph A. Dyer, Portland, ME, for Pamela Wood, Glenroy Wood, Plaintiffs.

James M. Moore, U.S. Attorney's Office, Bangor, ME, for United States, Defendant.

## ORDER ON DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT AND OTHER RELATED MOTIONS

SINGAL, District Judge.

Before the Court is Defendant's Second Motion to Dismiss, or in the alternative, for Summary Judgment (Docket # 37). The Court previously treated Defendant's First Motion (Docket # 10) as a motion for summary judgment. *See Wood v. United States*, 115 F.Supp.2d 9, 11 (D.Me.2000). For substantially the same reasons, the Court similarly treats Defendant's pending motion as a motion for summary judgment and GRANTS the Motion for the reasons described below.

Additionally, the Court herein decides the plethora of related pending motions, including: Plaintiffs' Motion to Strike Affidavits (Docket # 53); Plaintiffs' Motion to Supplement Pleading (Docket # 62); Defendant's Motion for Leave to File a Response to Footnote Two in Plaintiffs' Motion to Strike Affidavits (Docket # 65); Plaintiffs' Second Motion for Opportunity to Conduct Discovery (Docket # 66); and Plaintiffs' Motion in Limine to Bar Affidavits (Docket # 72).

## I. STANDARD OF REVIEW

Generally, a federal court grants summary judgment "if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "An issue is genuine 'if the evidence is such that a reasonable jury could return a ver-

dict for the nonmoving party.'" *Ayer v. United States*, 902 F.2d 1038, 1044 (1st Cir.1990) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Pursuant to the Local Rules, the Court has "no independent duty to search and consider any part of the record." Local Rule 56(e). Rather, the Court relies on the parties' submitted statements of material facts ("SMF") and the record citations found therein to construe the relevant facts. *See* Local Rule 56. The Court must view these facts "in the light most amicable to the party contesting summary judgment, indulging all reasonable inferences in that party's favor." *Pagano v. Frank*, 983 F.2d 343, 347 (1st Cir.1993). However, the nonmovant cannot rely on "'conclusory allegations, improbable inferences, and unsupported speculation.'" *Dynamic Image Techs., Inc. v. United States*, 221 F.3d 34, 39 (1st Cir.2000) (quoting *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990)).

██ In this case, Defendant's Motion primarily argues that this Court lacks subject matter jurisdiction over Plaintiffs' remaining claims because the United States has retained its sovereign immunity with regard to these claims. In order for the Court to have subject matter jurisdiction over Plaintiffs' claims against the United States, the claims must fit within the applicable waiver of sovereign immunity found in the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.* Generally, a plaintiff bears the burden of establishing subject matter jurisdiction. *See Pejepscot Indus. Park, Inc. v. Maine Cent. R. Co.*, 215 F.3d 195, 200 (1st Cir.2000). Thus, in light of Defendant's Motion, Plaintiffs bear the burden of proving that their claims either fit within the FTCA's waiver of

sovereign immunity or that that there is a genuine issue of material fact with regard to the applicability of the FTCA to their claims.

In light of these standards, the Court lays out the relevant facts below.

## II. BACKGROUND [1]

This case stems from an accident on August 23, 1998, in which Plaintiff Pamela Wood sustained serious injuries while painting VLF towers located on the Naval Computer and Telecommunications Station in Cutler, Maine (the "Cutler Naval Station"). At the time of the accident, Pamela Wood was employed by Abhe & Svoboda, Inc. ("Abhe & Svoboda" or the "Contractor"), a contractor who had been hired by the United States Navy to paint and repair the Cutler Naval Station VLF towers (the "Tower project").

*Navy's Duties under the Abhe & Svoboda Contract*

The Tower project was carried out pursuant to a contract between Abhe & Svoboda and the United States Navy that was entered into on October 29, 1996 ("Naval Contract N62472–95–C–0425" or the "Contract").[2] The Contract generally states that Abhe & Svoboda "shall provide appropriate controls to ensure a safe work environment for employees and to protect the public and Government employees, the work site and the environment." (Contract, Section 01560, ¶ 1.1.) More specifically, the Contract calls for the Contractor to submit a plan detailing their safety program and an accident prevention program (the "safety plan") that is subject to Navy approval. (*See id.* at ¶ 1.8.) The Contract requires that the submitted safety plan comply with various federal regulations, including relevant regulations of the Occupational Safety and Health Administration ("OSHA"). (*See id.* at ¶ 1.8.1–9.) Pursuant to the Contract, Abhe & Svoboda was also required to provide worker's compensation insurance in compliance with federal and state law. (*See* Contract, Section 00720, ¶ 1.13.)

Through the above-described language, the United States gave Abhe & Svoboda primary responsibility for its employees' safety. Nonetheless, the Contract also states:

The Contracting Officer will notify the Contractor of any noncompliance with the foregoing provisions and the action to be taken. The Contractor shall, after receipt of such notice, immediately take corrective action. Such notice, when delivered to the Contractor or his representative at the site of the work, shall be deemed sufficient for the purpose. If

---

1. Plaintiffs filed a Motion to Strike Affidavits (Docket # 53) that seeks to exclude from the Court's consideration three affidavits: Declaration of Normand Laberge, dated April 3, 2001; Declaration of Captain Glidden, dated April 5, 2001; and Declaration of William Cohen, dated April 5, 2001. Having reviewed the affidavits, the Court finds it is unnecessary to rely on them to construe the relevant material facts. Thus, the background section that follows does not reflect any information taken from these three affidavits. The Court notes that even if it were to consider the affidavits in question, the three affidavits would not affect the Court's decision on the merits. That said, the Court does not believe that

Plaintiffs' proffered arguments justify striking these affidavits. Under these circumstances, the Court DENIES Plaintiffs' Motion to Strike Affidavits.

As a result, the Court finds Defendant's Motion for Leave to File a Response to Footnote Two in Plaintiffs' Motion to Strike Affidavits (Docket # 65) is MOOT.

2. The relevant portions of the Contract have been submitted as Plaintiffs' Exhibit 13 and as an attachment to Defendant's Exhibit 6. Citations to the Contract will simply refer to the relevant sections and paragraphs of the Contract.

the Contractor fails or refuses to comply promptly, the Contracting Officer may issue an order stopping all or part of the work until satisfactory corrective action has been taken.

(Contract, Section 00721, ¶ 1.5(c).) By letter, the Contracting Officer, Marilyn Colot, delegated certain administrative functions under the Contract to Lt. Robert Schroeder, the Resident Officer in Charge of Construction ("ROICC") at Cutler Naval Station.[3] Among the many administrative functions delegated to ROICC Schroeder was "[e]nsur[ing] contractor compliance with safety requirements."[4] (Pls. Ex. F (att. to Pls. Ex. 22).) Project Engineers Mark Leighton and Kevin Barbee worked under ROICC Schroeder to monitor Abhe & Svoboda's work on the Tower Project including the Contractor's compliance with safety requirements.[5]

*The Nature of Abhe & Svoboda's Work on the Tower Project*

In relevant part, the Tower Project required that Abhe & Svoboda remove paint from various VLF towers located around the Cutler Naval Station and then repaint the towers, which range in height from approximately 200 to 980 feet. Because of the height of the towers, the work required the use of a two-part scaffolding system. The first part, the work platform, was the point from which workers would either remove or apply paint to a portion of the tower. In order to contain the paint, the work platform was shielded by tarps that prevented anyone on the ground from seeing what was occurring on the platform. The work platform was secured to the tower by three cables and could be moved down the tower as work on particular sections of the tower was completed.

The second part of the scaffolding system was the manlift. The manlift was used to carry workers up and down the tower to the work platform (although the work platform could also be accessed by climbing fixed ladders on the tower). The manlift was suspended from two cables and could be raised or lowered by operating two electric motors (one for each cable). The electric motors were operated by control boxes found in the manlift. Each control box contained three buttons: up, down, and emergency shutoff. In theory, the manlift was supposed to be accessed through a hatch door in the floor of the work platform. However, in practice, it appears that the hatch door was sealed and that Abhe & Svoboda workers would simply climb over the railing of the work platform to access the manlift.

In order to prevent workers from falling from the scaffolding, the safety plan, in

3. The parties have engaged in a rather extensive ancillary debate regarding the appropriate label to describe Ms. Colot's letter. Plaintiffs refer to the letter as a "directive." Defendant, on the other hand, insists that "directive" is a Naval term of art that does not apply to Ms. Colot's delegation letter. (*See* Decl. of William D. Cohen ¶ 3.) The Court concludes that this distinction is not material. Therefore, the Court disregards the Cohen affidavit. The Court notes that even if it were to consider the Cohen affidavit and its conclusion that the Colot delegation letter was not a "Navy instruction or directive," it would not change the conclusions reached by the Court.

4. Although the Court only highlights this specific administrative function that is applicable to Plaintiffs' claims, the Court notes that the delegation letter directed ROICC Schroeder that his office also was responsible for thirty other administrative functions with regard to the Abhe & Svoboda Contract. (*See* Pls. ex. F (att. to Pls. Ex. 22).)

5. Throughout this order the Court will refer to Leighton, Barbee and ROICC Schroeder jointly as "ROICC Cutler."

accordance with OSHA regulations, required workers to wear safety harnesses. These harnesses allowed workers to secure themselves by "tying off" their safety harnesses either directly to the tower or to independent lifelines erected by the Contractor. During the years in question, workers were not required to tie off their safety harnesses while on the work platform. However, they were supposed to wear their safety harnesses and tie off when in the manlift.

*The 1997 Construction Season*

Before beginning work on the Tower Project in 1997, Abhe & Svoboda submitted a safety plan that was reviewed by ROICC Cutler. After reviewing the initial plan, ROICC Cutler requested amendments to Abhe & Svoboda's safety plan, which were incorporated by the Contractor in April 1997.

As work began on the Tower project, various Cutler employees witnessed what they believed to be unsafe work practices by Abhe & Svoboda employees working on the towers. As a result, alleged safety violations were reported to OSHA and ROICC Cutler. Then, in August 1997, Abhe & Svoboda had two accidents involving problems with scaffolding systems being used on the Tower project. The Navy investigated one of the accidents and, as a result, recommended a review of the fall protection and rescue plan, the designation of a competent fall protection person and better training for employees working on scaffolding about all aspects of safety. An OSHA investigation of both accidents reached substantially similar conclusions regarding the work site safety deficiencies. As a result, OSHA cited Abhe & Svoboda for serious and willful safety violations for

which the Contractor was required to pay a fine.[6]

Following the accidents, in a letter, dated August 27, 1997, Project Engineer Leighton of ROICC Cutler informed Abhe & Svoboda that they were not in compliance with all of the provisions of the approved safety plan. Out of concern that the Contractor was ill-prepared to address the scaffolding issues raised by the accidents, Abhe & Svoboda was asked to bring in a scaffolding supplier to advise them on the erection and operation of the scaffolding. Additionally, ROICC Cutler ultimately requested that the Contractor revise its safety plan before the start of the 1998 construction season. In accordance with the Navy's investigation, these revisions focused on attempting to ensure complete compliance with the substantive provisions of the safety plan.

*The 1998 Construction Season*

In a letter to Abhe & Svoboda, dated May 26, 1998, Project Engineer Leighton noted that Abhe & Svoboda had not submitted their updated documentation including an amended safety plan and that if the documentation was not received by June 1, 1998, work would be stopped on the Tower Project until acceptable documentation was received. In response, Abhe & Svoboda submitted their revised safety plan to ROICC Cutler on June 1, 1998. ROICC Cutler determined that this amended safety plan was adequate.

Pursuant to the amended safety plan, Abhe & Svoboda would employ a full time safety officer. In their June 1st letter, Abhe & Svoboda informed ROICC Cutler that Josh Callander was hired as their designated safety officer.[7] Mr. Callander

---

**6.** According to Plaintiffs' expert, Mr. Flynn, these 1997 OSHA violations should have served as a "blueprint" for ROICC Cutler's safety monitoring during the 1998 Construc-

tion Season. (Dep. of Robert Flynn at 100 (Pl.Ex. 23).)

**7.** After the 1998 accident that serves as the basis for Plaintiffs' claims, the Navy discover-

along with other Abhe & Svoboda supervisors provided weekly safety training to the Abhe & Svoboda workers on the Tower project. This weekly training, which included instruction on the use of safety harnesses and operation of the manlift, had not been provided during the 1997 season.

During the 1998 construction season, Abhe & Svoboda employed approximately twenty-five people to work on the Tower project. These Abhe & Svoboda employees worked seven days a week and approximately ten to twelve hours a day. Because the Towers were located at various locations, Abhe & Svoboda employees worked at four or five different sites on any given day.

Although no written regulation or policy mandated the frequency or length of ROICC Cutler's inspections of the Tower project, project engineers from ROICC Cutler conducted walk through inspections of Abhe & Svoboda work sites two or three times a week during the 1998 season. During an inspection, a member of ROICC Cutler personnel would generally walk through one or more work sites remaining on the ground the entire time. Because any given inspection lasted about an hour, ROICC Cutler personnel were essentially in attendance at one of the Abhe & Svoboda work sites for approximately three to five hours a week.

In addition to the inspections, ROICC Cutler staff monitored the Contractor by reviewing daily logs submitted by the Contractor[8] and investigating any complaints.[9] To the extent ROICC Cutler was aware of a violation of the safety plan, it informed Abhe & Svoboda of the violation in accordance with the Contract. ROICC Cutler determined that the reported violations were not inherently dangerous and that, in any event, the Contractor was responsive to any reported violations. In considering what actions to take in light of a contractor safety violation, ROICC Cutler considered their assessment of the seriousness of the violation, as well as the potential economic cost to the Navy for suspension or termination of the Contract and the environmental pressures related to delay in removing the existing peeling paint, which contained lead and PCBs.

On Sunday, August 23, 1998, the date of the accident, Abhe & Svoboda was solely responsible for supervision of its workers. Because it was a Sunday, no one from ROICC Cutler was working and, as a result, no one from ROICC Cutler conducted any inspection of the Tower project work

---

ed that Callander was hired as a safety intern and was also working as a painter for the Contractor.

8. The daily logs detailed Abhe & Svoboda's work and included information on the weather conditions, work performed, progress made, workplace injuries, matters having an impact on the environment and the content of any training sessions the Contractor held.

9. Many of the documented complaints came from civilian employees who reported unsafe practices they witnessed in 1997 through their union representative, Elmer Harmon. In July 1998, Mr. Harmon renewed his general objection that Abhe & Svoboda was not in compliance with safety requirements. In response, ROICC Schroeder asked Harmon to report any suspected violations to the ROICC office as soon as possible. Additionally, Dexter Noonan, Cutler's civilian safety officer, responded by telling Harmon that Cutler's Commanding Officer had asked him to do "regular visits on the contractors site to make sure they stay in compliance." (Ex. 3 at 583 (att. to Dep. of Elmer Harmon (Pl.Ex. 24).)) The Court notes that Mr. Noonan did make three twenty minute visits to the Tower project work sites in the Summer of 1998. However, because he was not part of ROICC Cutler, he was not responsible for ensuring Abhe & Svoboda's compliance with contract requirements.

sites prior to the accident. On that day, Pamela Wood was painting tower N–1 along with three other Abhe & Svoboda employees, David Boutell, Steve Bailey and Josh Callander (the designated safety officer).

On that fateful Sunday, Wood and her crew followed what had been adopted as the typical work procedure of riding in the manlift with their materials to the work platform. After unloading, one crew member rode the manlift down approximately 75 feet, lashed the manlift to the tower and then climbed the ladders back up to the work platform. This procedure prevented the manlift from swaying in the wind. To prevent the manlift cables from swaying in the wind, the cables were secured on the ground with 3000 pound concrete blocks.

Sometime that afternoon, the crew was working on the platform at about 250 feet. Because the manlift was at about 245 feet, a member of the crew had to leave the platform to lower the manlift. Boutell was sent to complete this task although he had never done it previously. Wood noticed that Boutell appeared to be having difficulty moving the manlift and left the work platform to help him. At this point, both Boutell and Wood were in the manlift but neither was wearing a safety harness as required under the safety plan. From inside the manlift, Wood apparently noticed tremendous strain on the cables below the manlift. At that moment, the manlift broke away from the tower and fell approximately 70 feet. Boutell was thrown from the manlift and died as a result of fatal injuries sustained during the fall. Wood remained in the manlift but sustained injuries for which she was hospitalized.

Following the accident, ROICC Cutler temporarily stopped work on the Tower project by ordering a "stand down" to allow for a safety review. A "stand down" was used in lieu of an official suspension by the Navy in order to save the Navy from having to pay the Contractor for time lost due to suspension.

OSHA conducted an investigation to examine the Contractor's compliance with OSHA regulations at the time of the accident. As a result of the investigation, OSHA cited Abhe & Svoboda for numerous safety serious violations at the N–1 tower including failure to have a competent person inspect suspended work platforms before shift and failure to train employees in proper use and load capacities of scaffolds. OSHA also cited Abhe & Svoboda for willful violations based on its construction of the scaffolding at the N–1 towers. Among the practices that OSHA cited as support for this violation were: (1) use of 3000 pound concrete blocks to control the manlift cables, (2) tying off the manlift to the tower, (2) failure to have a working access door on the floor of the work platform; (3) use of inappropriately oversized motors on the manlift; (4) reversed wiring on the control boxes of the manlift; (5) unmarked up and down buttons caused by the buttons being covered in paint; and (6) failure to protect employees on the manlift or the fixed ladders with the use of fall arrest systems. (*See* OSHA Citation and Notification of Penalty, dated Feb. 4, 1999, at 4–11 (Pls. Ex. Q (att. to Dep. of Mark Leighton (Pls.Ex. 26).))) It appears that these practices contributed to Boutell unknowingly pushing the wrong button on the controls of the manlift sending the manlift up rather than down. As a result, the oversized motor on the manlift caused the cable to lift the cement block thereby straining and breaking the cable and sending the manlift into its fall.

Although at least one official from ROICC Cutler acknowledged his awareness that prior to the accident in August 1998 the Contractor was not in one hun-

dred percent compliance with the safety plan, there is no evidence suggesting that during the 1998 construction season anyone from ROICC Cutler was aware of any of the safety violations that contributed to the August 23rd accident. Additionally, none of the evidence suggests that anyone from ROICC Cutler failed to report any known safety violation to Abhe & Svoboda prior to August 23, 1998.

*1999 Construction Season*

Abhe & Svoboda amended its safety plan again in the Fall of 1999. This amendment included a new Navy guideline that clarified the safety responsibilities of contractors.

On April 15, 1999, Kevin Barbee of ROICC Cutler met with Lt. Wakeman and other Cutler civilian employees, including civilian environmental engineer Norman Laberge, to discuss ongoing environmental issues with the work plan on the Tower project. In response to Mr. Laberge's suggestion that Navy personnel become directly involved in ensuring environmental compliance, Mr. Barbee indicated that this type of involvement went beyond the Navy's basic contractual oversight duties. Mr. Barbee further indicated that the Navy has already become too involved in Abhe & Svoboda's safety compliance thereby increasing its own liability.[10]

## III. DISCUSSION

A. Plaintiffs' Second Motion for Opportunity to Conduct Discovery (Docket # 66)

Before confronting the merits of the underlying motion for summary judgment, the Court must first resolve Plaintiffs' Motion seeking an opportunity to conduct further discovery pursuant to Rule 56(f). The Court previously granted Plaintiffs such an opportunity in September 2000. *See Wood,* 115 F.Supp.2d at 16. Now, at the eleventh hour, Plaintiffs again seek to invoke the provisions of Rule 56(f) claiming they have information that the Navy has requested funding for five additional safety inspectors to monitor Abhe & Svoboda during the 2001 season. Plaintiffs argue that if they had an opportunity to conduct discovery on this information it would evidence the Navy's "historical penchant for control of [Abhe & Svoboda]'s safety practices." (Pls. Second Mot. for Opportunity to Conduct Discovery at 1 (Docket # 66).) Plaintiffs argue that evidence of remedial measures taken by Defendants during the 2001 season would be admissible to show control pursuant to F.R.E. 407.

---

**10.** For purposes of this Motion, the Court is liberally construing the facts related to the April 15, 1999 meeting. It appears that Plaintiffs believe that if they can prove that Mr. Barbee's alleged statement regarding the Navy's increased liability on safety issues referred to Navy supervision of the Contractor *prior to* the accident, they can overcome summary judgment Assuming such proof is possible, Plaintiffs' substantial reliance on Mr. Barbee's alleged statements at the meeting are problematic in several respects. First, Plaintiffs' sole evidence with regard to Mr. Barbee's statement consists of unofficial minutes taken by Mr. Laberge. At trial, it is unlikely that Plaintiffs could rely on these minutes to offer Mr. Barbee's statements for the truth of the matter asserted. Second, Mr. Barbee's alleged post-accident statement is nothing more than a legal conclusion that he is not qualified to give. Thus, Mr. Barbee's statement has little to no relevance to the issues at hand.

On the basis of this substantive finding, the Court DENIES Plaintiffs' Motion to Supplement Pleading (Docket # 62), which seeks to enter into evidence a second affidavit by Norman Laberge, in which Mr. Laberge explains that he interpreted Mr. Barbee's statement on April 15, 1999, as referring to the Navy's supervision of Abhe & Svoboda prior to the August 23, 1998 accident. In ruling on this motion, the Court incorporates its more extensive discussion of the infamous Laberge Declarations found in its Order on Plaintiffs' Motion for Sanctions (Docket # 71).

Defendant, in turn, responds that Plaintiffs have had ample opportunity to conduct discovery and that the facts Plaintiffs now allege they could uncover if given further time for discovery would not create a genuine issue of material fact. The Court agrees. The measures that the Navy may be considering to monitor contractor compliance with safety requirements in 2001 is of little probative value to the issue before the Court, namely, the Navy's supervision in 1998. While Plaintiffs suggest that five additional safety inspectors may be hired, there is no suggestion that these additional inspectors will have day-to-day control over the contractor.

■ Having closely reviewed the rather voluminous evidence submitted by both parties, the Court cannot say that any newly uncovered evidence showing that the Navy intends to use more people to more closely monitor Abhe & Svoboda's work in 2001 would change the Court's decision laid out below. In short, the Court believes that Plaintiffs Second Motion does not ·involve "facts essential to justify [Plaintiffs'] opposition." Fed. R.Civ.P. 56(f). In light of these conclusions, the Court DENIES Plaintiffs' Second Motion for Discovery and finds that Plaintiffs' Motion in Limine seeking to bar the affidavits that Defendant attached to its response brief (Docket # 72) is MOOT.

## B.  Federal Tort Claims Act ("FTCA")

With the facts laid out and all ancillary motions resolved, the Court, at last, turns to the merits of Defendant's Second Motion for Summary Judgment. In its Mo-

tion, Defendant argues that the remaining claims contained in Counts II and III are barred by various exceptions to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.* Namely, the United States invokes the discretionary function exception and the independent contractor exception. Defendant's arguments require the Court to revisit legal issues previously raised by Defendant in light of the more developed factual record. Thus, rather than reinvent the wheel, the Court incorporates its previous discussion of the FTCA and the exceptions thereto in deciding this Motion. *See Wood,* 115 F.Supp.2d at 13–16. Before the Court turns to its application of these exceptions, it is appropriate to clarify the claims encompassed in Counts II and III.

## 1.  Count II

In Count II, Plaintiffs state a claim pursuant to Restatement (Second) of Torts §§ 343 & 343A (1965). As the Maine Law Court has explained, this Restatement section "imposes on the possessor of land a duty to use reasonable care to prevent risks arising from known and obvious conditions on the land that the possessor should reasonably anticipate causing harm to others despite such knowledge or obviousness." *Colvin v. A.R. Cable Services– ME, Inc.,* 697 A.2d 1289, 1291 (Me.1997). Under this claim, the conduct that allegedly caused Plaintiffs' harm was the failure of ROICC Cutler to prevent risks arising from the obviously improper construction and use of scaffolding by the Contractor in violation of the safety plan.[11] According to

11.  For purposes of this discretionary function exception analysis, the Court assumes, without deciding, that this conduct could serve as the basis for a claim pursuant to Restatement (Second) of Torts §§ 343 & 343A (1965). However, the Court notes that it is far from clear that contractor compliance with the

safety plan or scaffolding improperly erected and used by a contractor qualifies as an obvious condition on the land. *See Dickinson v. Clark,* 767 A.2d 303, 306–07(Me.2001) (finding that minor injured while operating a log splitter could not state a claim against the landowner under Restatement (Second) of

Plaintiffs, in light of the obvious lack of compliance with the safety plan, ROICC Cutler should have either more closely monitored Abhe & Svoboda to ensure compliance with the safety plan or suspended work on the Tower project all together.[12] Thus, for purposes of Count II, the conduct of the Navy that allegedly caused harm to Plaintiffs was the failure to either more closely monitor Abhe & Svoboda's compliance with the safety plan or, alternatively, order a suspension of work on the Tower project.

### 2. Count III [13]

Plaintiffs also assert that the Navy is liable for Ms. Wood's injuries under the theory that the Navy failed to exercise due care in its supervision of a contractor hired to perform work that involved a peculiar risk. *See* Restatement (Second) of Torts §§ 413 & 414 (1965). This "peculiar risk theory" of liability is an exception to the general rule that "the employer of an independent contractor is not liable for the physical harm caused to another by an act or omission of the contractor or his servants."[14] Restatement (Second) of Torts § 409 (1965).

With regard to Plaintiffs' reliance on Restatement section 413, the Court notes that the Contract between the Navy and Abhe & Svoboda provided for the Contractor to take the necessary special precautions by requiring an approved safety plan. Therefore, viewing the facts in the light most favorable to Plaintiffs, the Navy fulfilled its duties under section 413. Turning to section 414, this theory of peculiar risk liability relies on the Navy having retained a degree of control over the independent contractor's work.[15] *See id.* § 414. Thus, the conduct that allegedly caused the harm under Count III was the Navy's failure to reasonably exercise its retained control to monitor and to suspend work.

Because both Counts II and III essentially rely on the same conduct by the Navy as a basis for liability, the Court's

Torts § 343A since minor's claim alleged "negligent supervision and instruction on the use of a piece of equipment" rather than premises liability).

**12.** Since there is no evidence suggesting that ROICC Cutler knew of any of the conditions that led to the accident, Plaintiffs' claim can only be read as suggesting that ROICC Cutler should have known about these conditions because they were obvious.

**13.** Count III of Plaintiffs' Complaint invokes the Restatement theory of "peculiar risk liability." As the Court has previously explained, Maine has not adopted this theory of liability found in Restatement (Second) of Torts §§ 413 & 414. *See Wood*, 115 F.Supp.2d at 15 n. 5. Given the Court's conclusion that it does not have subject matter jurisdiction over Count III, the Court need not address the issue of whether, on the facts presented, Maine law would allow Plaintiffs to pursue a claim based on peculiar risk liability.

**14.** The Court notes that this general Restatement rule is substantially similar to the independent contractor exception to the FTCA.

**15.** In fact, the Restatement explains that with regard section 414 liability, "[i]t is not enough that [the employer] has merely retained a general right to order work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations." Restatement (Second) of Torts § 414, cmt. c. (1965). Viewing the facts in the light most favorable to Plaintiffs, it appears that the control retained by the Navy was within this general right. Thus, although the Court does not reach the merits of Count III because of its holding with regard to subject matter jurisdiction, the Court is doubtful that Plaintiffs can state a claim under section 414.

application of the FTCA's exceptions is applicable to both counts.

### 3. Application of the Discretionary Function Exception

■ As the Court has previously explained, determining whether a claim falls under the discretionary function exception requires the Court to first "identify the conduct that allegedly caused the harm." *Shansky v. United States,* 164 F.3d 688, 690 (1st Cir.1999). *See Wood,* 115 F.Supp.2d at 13–14. The Court, then, must separately consider two questions: "Is the conduct itself discretionary? If so, is the discretion susceptible to policy-related judgments?" *Shansky,* 164 F.3d at 691. *See also Wood,* 115 F.Supp.2d at 13.

#### a. Is the Conduct Discretionary?

■ Both of Plaintiffs' remaining claims allege that the conduct that caused harm to Ms. Wood was either the Navy's failure to enforce the safety plan or the Navy's failure to suspend work on the Tower project in light of the Contractor's track record of failing to substantially comply with the safety plan. In short, Plaintiffs have failed to produce evidence showing that any statute, regulation or policy explicitly mandated the circumstances under which the Navy was to suspend work or the frequency or method of monitoring the Contractor's safety. Thus, the Court concludes that both the monitoring and the right to suspend work were discretionary functions. *See Irving v. United States,* 162 F.3d 154, 163 (1st Cir.1998) (explaining that under the FTCA "a function is non-discretionary only when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.") (internal quotations omitted).

Arguably, by reading the Contract and the delegation letter in concert, one could say that ROICC Cutler has some nondiscretionary duties related to Abhe & Svoboda. *See Irving,* 162 F.3d at 164 (stating that "informal agency rules and similar pronouncements may at times bind agency personnel for the purposes of discretionary function exception analysis"). First, to the extent ROICC Cutler was aware of a safety violation, it had a nondiscretionary duty to inform the Contractor of the safety violation. For example, if ROICC Cutler personnel conducting an inspection observed that an Abhe & Svoboda employee was not using his or her safety harness, ROICC Cutler was required to bring that to the attention of the Contractor. Similarly, it could be said that ROICC Cutler had a nondiscretionary duty to ensure that Abhe & Svoboda's safety plan met the requirements laid out in the Contract. Thus, it could not choose to approve a safety plan that fell short of the Contract's requirements. However, Plaintiffs do not argue that the conduct that caused the harm in this case stemmed from the Navy's approval of an inadequate safety plan or the Navy's failure to notify the Contractor of known safety violations.[16]

---

**16.** In their brief, Plaintiffs do state that "[t]he Navy made a conscious and intentional decision not to give notice or require compliance with the safety plan in order to save time and money." (Pls. Obj. to Second Motion for Summ. J. at 9 (Docket # 48).) Based on the evidence before the Court, there is no basis for finding that the Navy was aware of a safety violation and failed to notify the Contractor. Additionally, even construing the evidence submitted in the light most favorable to Plaintiffs, no reasonable jury could conclude that the Navy made "a conscious and intentional decision" to not require compliance with the safety plan. At best, the evidence suggests that the Navy was negligent in ensuring compliance with the safety plan because a reasonable person aware of Abhe & Svoboda's previous safety violations would have done more to ensure compliance with the safety plan.

Rather, Plaintiffs rely on ROICC Cutler's alleged failure to ensure contractor compliance with the safety plan. No statute, regulation or policy prescribed the manner in which the Navy or ROICC Cutler, in particular, was to monitor the Contractor's compliance with the safety plan. *See Irving,* 162 F.3d at 163. It was within the Navy's discretion to decide how to best monitor safety compliance. The Navy, in turn, delegated this discretion to ROICC Cutler, which was in a better position to monitor the Contractor because of its on-site location. Whether ROICC Cutler chose to conduct monthly, weekly or daily inspections or simply to rely on the Contractor's daily logs, their monitoring remained discretionary.

Similarly, there were no circumstances under which ROICC Cutler or the Navy had to suspend work on the Tower project. In fact, even after the August 23, 1998 accident in which Ms. Wood was seriously injured and Mr. Boutell was killed, the Navy did not invoke its right to suspend work on the Tower project. With the benefit of hindsight, Plaintiffs argue that ROICC Cutler should have seen the writing on the wall with regard to Abhe & Svoboda's inattention to safety. However, in the context of the FTCA's discretionary function exception, this failure to more closely supervise or suspend the Contractor was, at most, an abuse of discretion.

b. Is the Discretion Susceptible to Policy–Related Judgments?

■ Turning to the second step of the discretionary function inquiry, the Court concludes that the monitoring of the Contractor as well as the decision to suspend work on the Tower project was susceptible to policy judgments. *See Shansky,* 164 F.3d at 692 (explaining that this second prong focuses on "whether some plausible policy justification could have undergirded the challenged conduct."). Generally, discretionary functions are presumed to be grounded in policy. *See Irving,* 162 F.3d at 168. Plaintiffs have not produced any evidence to overcome this presumption.

With regard to the inspections, the Court notes that pursuant to the delegation letter, ROICC Cutler was responsible for monitoring not only safety compliance but also a variety of other matters including the contractor's financial condition, labor issues, environmental issues and whether the work was proceeding on schedule. Nothing in the delegation letter or any other Navy policy mandated that ensuring compliance with safety requirements trumped all other administrative functions. Thus, project engineers conducting on-site inspections as well as other types of monitoring had to consider and prioritize all of the various administrative functions. *See Irving,* 162 F.3d at 168. Under these circumstances, the inspections conducted by ROICC Cutler are not distinguishable from the OSHA inspections that the First Circuit found to fall within the discretionary function exception in *Irving. See id.* at 162–69.

With regard to suspension, it is clear that the decision to invoke the Navy's contractual right to suspend work was grounded in policy. ROICC Cutler personnel considered not only safety issues but also the costs to the Navy as well as environmental issues. In light of these other considerations, the Navy chose not to suspend work following the tragic accident that gave rise to this case. While Plaintiffs may disagree with how the Navy prioritized safety in the face of all of these other issues, the fact remains that the discretionary function exception protects these policy judgments from review by this Court.

Therefore, the Court concludes that Count II and III fall within the discretion-

ary function exception to the FTCA. Thus, the Court does not have subject matter jurisdiction over these claim and grants summary judgment for Defendants on this basis.

4. Independent Contractor Exception

 In the alternative, the Court notes that on the evidence presented no reasonable jury could find that the Navy was supervising the day-to-day operations of Abhe & Svoboda prior to August 23, 1998. Thus, to the extent Counts II and III attempt to make the United States liable for the apparent negligence of Abhe & Svoboda, such claims are barred by the independent contractor exception. *See United States v. Orleans*, 425 U.S. 807, 815, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976) (holding that claims against the United States are barred by the independent contractor exception unless the contractor's "day-to-day operations are supervised by the Federal Government").

In the end, Plaintiffs have attempted to argue that their claims lie within the Court's subject matter jurisdiction because they fall somewhere in between the discretionary function exception and the independent contractor exception. To the extent such a crack in the United States' sovereign immunity possibly exists, Plaintiffs claims simply do not fit through this narrow opening.

## IV. CONCLUSION

Based on lack of subject matter jurisdiction, the Court GRANTS Defendant's Second Motion for Summary Judgment (Document # 37). Additionally, for the reasons described herein, the Court DENIES Plaintiffs' Motion to Strike Affidavits (Docket # 53), Plaintiffs' Motion to Supplement Pleading (Docket # 62), and Plaintiffs' Second Motion for Opportunity to Conduct Discovery (Docket # 65). In light of these rulings, both Defendant's Motion for Leave to File a response to Footnote Two (Docket # 65) and Plaintiffs' Motion in Limine to Bar Affidavits (Docket # 72) are MOOT.

SO ORDERED.