# United States Court of Appeals
## For the First Circuit

No. 01-2028

PAMELA WOOD, GLENROY WOOD,

Plaintiffs, Appellants,

v.

UNITED STATES,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Lynch, Circuit Judge,

Campbell, Senior Circuit Judge,

and Lipez, Circuit Judge.

Ralph A. Dyer with whom the Law Offices of Ralph A. Dyer, P.A.
was on brief for appellants.
F. Mark Terison, Senior Litigation Counsel, with whom Paula D.
Silsby, United States Attorney, were on brief for appellee.

May 10, 2002

**CAMPBELL**, **Senior Circuit Judge**.  The district court case from which this appeal is taken derives from an accident at the Cutler Naval Computer and Telecommunications Station on August 23, 1998 in which plaintiff Pamela Wood sustained serious injuries and a coworker was killed.  Wood was employed at the time by Abhe & Svoboda, Inc. ("ASI"), an independent contractor chosen by the Navy to remove lead from, and to paint, the tall radio towers located on the naval base in Cutler, Maine.  On December 15, 1999, Wood and her husband filed a four-count complaint against the United States alleging negligence and loss of consortium and seeking punitive damages under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671, et seq.  (1994 & Supp. 2001).  On the government's motion, the court granted summary judgment against the Woods, and this appeal followed.

**I.**

**A.   The Facts**

**1.   The Contract**

In 1996, the Navy sought contractor bids for the lead abatement and painting of radio towers ranging in height from 200 to 750 feet, located on the naval base in Cutler, Maine.  As part of the award process, bidders were required to submit a two-part proposal.  The first part related to pricing alone.  The second part consisted of a "technical proposal" with four factors to be addressed:  (1) technical expertise (including schedule, quality

control, technical approach, and environmental control); (2) corporate management (including organizational structure, management plan, technical personnel, and subcontracting); (3) past experience; and (4) safety plan (including safety plan, safety record, proposed safety procedures, and safety programs/safety awareness/EMR rating). In evaluating each bid, the Navy weighted price and technical factors equally and the four technical factors were also weighted equally with respect to each other. ASI submitted a proposal and was awarded Naval Contract N62472-95-C-0425 (the "Contract") on October 29, 1996. The Contract required that ASI provide "appropriate controls to ensure a safe work environment for employees." Prior to the start of work, ASI was obligated to submit a safety plan demonstrating how the contractual safety goals would be accomplished. ASI presented a safety plan that dictated, inter alia, that all employees exposed to the possibility of falling would wear safety belts and that a project superintendent would make periodic inspections of equipment to assure it was in safe operating condition and properly maintained. According to the plan drafted by ASI, ASI's supervisors would "have the responsibility and the absolute authority to enforce [its] job safety program" to "ensure that no laborer or mechanic employed on this project is allowed to work in surroundings or under conditions which are . . . dangerous to his/her health or safety." In addition, the Contract provided that ASI would comply with all

federal safety regulations as well as the "Safety and Health" provisions of the Corp of Engineers Manual.

According to the Contract, the Navy was to notify ASI of any non-compliance with the applicable safety provisions of the Contract and identify the corrective action to be taken by ASI. If ASI failed or refused to comply, the Navy was given the option to "issue an order stopping all or part of the work until satisfactory corrective action ha[d] been taken."

## 2. Safety Violations

After ASI commenced work, the Navy made limited and cursory inspections of the work site. According to the testimony of Navy personnel, it conducted walk-through inspections of the ASI work site several times a week. Each inspection lasted less than an hour and the inspections were confined to the ground level. The inspections were meant to serve a dual purpose: to monitor the quality of ASI's work and to identify possible safety infractions. As required by the Contract, the Navy notified ASI of safety violations that it recognized. In 1997, after being apprized by Navy personnel that ASI was not in compliance with certain safety requirements, the Navy contacted ASI and requested that particular corrective actions be taken. A letter was sent on March 27, 1997, pointing out necessary amendments to ASI's safety plan. After a severe accident on August 20, 1997, another letter was sent to ASI by the Project Engineer, Mark Leighton. In a letter dated

August 26, 1997, Leighton noted that ASI was not in compliance with the approved safety plan. On September 17, 1997, yet another letter was sent observing that ASI had failed to address certain issues outlined in the August 26 letter. The Navy recommended a review of ASI's fall protection plan and comprehension training for all employees working on scaffolding.

Meanwhile, the Occupational Safety and Health Administration ("OSHA") was also investigating ASI's compliance with mandated safety regulations after the accident of August 20 had caused serious injury to one of ASI's employees. The accident occurred when two employees were riding a suspension scaffold. The wire cable holding the scaffold broke, dropping the workers to a roof thirty feet below. OSHA cited ASI with eight violations classified as "serious" and administered a penalty of $80,000. During the course of the investigation, OSHA uncovered a similar accident that had occurred just two weeks prior in which a cable broke on a scaffold suspended 720 feet in the air. Fortunately, the five employees on that scaffold reached the ground safely. It appears from the record that ASI had not informed the Navy of the earlier August accident.

As a result of OSHA's investigation and report, issued in February 1998, the Navy informed ASI that, before the 1998 construction season began in June, a revised safety plan, along with several other items, would have to be submitted. After two

months had elapsed and ASI had not proffered the requested documents, the Navy threatened to prohibit the start of work on June 1, 1998. On that date, ASI responded to the Navy's requests, and it also hired a full-time Health and Safety Officer, Josh Callander.

### 3. The Accident

On Sunday, August 23, 1998, Wood, David Boutell, Steve Bailey and Josh Callander were painting one of the towers. They were approximately 250 feet above the ground. As was the norm, the crew had ridden to the work platform on a man-lift.[1] Once the crew arrived, one member descended in the man-lift a short distance, secured it to the side of the tower and then returned to the work platform via the internal ladder. As the crew progressed in its work, the work platform was lowered and eventually the man-lift needed to be lowered as well. It was at this juncture of the process that Bailey instructed Boutell to lower the man-lift.

Boutell left the work platform without his safety harness. Unfamiliar with operating the man-lift, Boutell was having difficulty with the controls and Wood went to assist him. She too failed to wear her safety harness. Apparently the wiring

---

[1] A man-lift is essentially scaffolding suspended by two cables from one side of the work platform. The man-lift is raised and lowered by two electric motors, one for each cable, with a button for UP, a button for DOWN, and an emergency kill button. In this case, the man-lift cables were secured to the ground with a large, concrete block to prevent the cables from swinging in the wind.

of the man-lift's motor control buttons had been reversed during an earlier repair and had not been re-labeled to reflect the change. As a result, the cable securing the man-lift moved up rather than down. In so doing, it pulled on a large, 3,000 pound concrete block to which the end of the cable was attached. This action strained and broke the ropes securing the man-lift. The man-lift fell approximately 70 feet before the slack in the cable ran out. Boutell was thrown to his death. Wood managed to remain on the platform but sustained injuries.

The subsequent OSHA investigation resulted in the assessment of penalties of $383,500 against ASI. Five citations were considered wilful and resulted in the maximum penalty allowed under law. Several of the citations were directly related to the accident. Specifically, OSHA cited ASI for making unauthorized modifications to the scaffolds and their controls, including tying off the man-lift to the tower, attaching the man-lift to a fixed object on the ground, reversing the control buttons on the man-lift's hoist control and failing to label the change, and failing to ensure that employees working were protected by the means of a "personal fall arrest system." Following the accident, the Navy temporarily suspended work on the towers.

Pamela Wood and her husband thereafter brought this action in district court. In their complaint, the Woods allege that the Navy acted negligently in both the selection and the

supervision of Wood's employer, ASI. In Count I, the Woods asserted that the Navy had negligently selected ASI to be the contractor for the project. In Counts II and III, the Woods alleged that the Navy had failed to take the precautions necessary to protect ASI employees against known dangers, both by failing to ensure a safe work environment and by failing to exercise reasonable supervisory control over ASI. Finally, in Count IV, the Woods sought punitive damages.[2]

The government moved to dismiss the complaint and, in the alternative, sought summary judgment, asserting that the Woods' claims were barred by the "discretionary function" exception to the FTCA. 28 U.S.C. § 2680 (1994). After allowing limited discovery, the district court concluded that the conduct alleged to be negligent fell within the discretionary function exception. See Wood v. United States, 148 F. Supp.2d 68 (D. Me. 2000); Wood v. United States, 115 F. Supp.2d 9 (D. Me. 2000). Alternatively, the court determined that ASI was an independent contractor, and that the Navy was not liable for any breach of ASI's duty to Wood as its employee. We affirm.

---

[2] The FTCA does not allow for the imposition of punitive damages against the United States. 28 U.S.C. § 2674. Consequently, the Woods do not challenge the dismissal of Count IV.

-8-

## A. The Federal Acquisition Regulations

In the Competition in Contracting Act of 1984 ("Act"), Congress created the Office of Federal Procurement Policy ("Office") to exercise responsibility for, and oversight of, the procurement of property and services[3] for the federal government. 41 U.S.C. § 404 (1987 & Supp. 2001). To the administrator of the Office ("Administrator"), Congress granted the discretion to prescribe reasonable rules and regulations governing the procurement of property and services by an executive agency, including departments of the military. Id. §§ 403, 404. The goal of the Act is to obtain maximum efficiency in the expenditure of public resources.

To implement a uniform procurement system, the Administrator has promulgated a set of rules and regulations, the Federal Acquisition Regulations ("FAR"), 48 C.F.R. § 1 et seq. (2001), that broadly outline procurement policies and procedures for the acquisition of goods and services by the government on behalf of the American taxpayer. It grants broad discretion to "local procurement officials to take independent actions based on their professional judgment" so as to obtain the "best value

---

[3]The term procurement refers to all stages of the process of acquiring property or services, starting with the identification of the need for the property or service and ending with contract completion. 41 U.S.C. § 403.

product or service." Id. §§ 1.102, 1.102-2(c)(2). "Best value" is viewed "from a broad perspective and is achieved by balancing the many competing interests" in a system that promotes efficiency and the maximization of resources. Id. § 1.102-1(b). To achieve efficient operations, the FAR "shifts its focus from 'risk avoidance' to one of 'risk management.'" Id. § 1.102-2(c)(2). The FAR views the cost to the taxpayer of attempting to eliminate all risk as prohibitive. To avoid these costs, the FAR encourages the broad use of discretion. It explicitly states that "[t]he Executive Branch will accept and manage risk associated with empowering local procurement officials to take independent action based on their professional judgment." Id.

Congress provided guiding principles concerning the retention of contractors like ASI by the Navy. Id. §§ 9.104-1, 9.104-3. Pursuant to both the statute and the FAR, some of the factors to be considered include whether the prospective contractor has adequate financial resources; the ability to comply with delivery and performance schedule; a satisfactory performance record; and a satisfactory record of integrity and business ethics. 41 U.S.C. § 403(7)(Supp. 2001); 48 C.F.R. § 9.104-1(a)-(d). Safety considerations are mentioned within the broad category of having "the necessary organization, experience, accounting and operational controls, and technical skills, or ability to obtain them (including, as appropriate, such elements as . . . safety programs

-10-

applicable to materials to be produced or services to be performed . . . .)." 48 C.F.R. § 9.104-1(e). Thus, in this case, the Navy was to consider a variety of factors - safety programs among them - when it evaluated bids and selected a contractor.

In regards to safety issues, the FAR mandates that certain provisions be placed in the contract; these delegate primary responsibility to the contractor to maintain a safe work environment. Id. § 36.513. According to the required contract clauses, the contractor must comply with all federal safety laws and regulations, id. § 52.236-13(b)(2), must follow the pertinent provisions of the United States Army Corps of Engineers Safety and Health Requirements Manual, id. § 52.236-13(c), and must ensure that any additional safety measures required by the contracting officer are taken, id. § 52.236-13(b)(2). In addition, if the contract involves hazardous work or materials, the contractor is required to submit a written plan that must include "analysis of the significant hazards of life, limb, and property inherent in contract work performance and a plan for controlling these hazards." Id. § 52.236-13(f)(1).

While the FAR gives primary responsibility for safety to the contractor, the contracting officer is required to notify the contractor of any instances, coming to the officer's attention, of "noncompliance with these requirements or any condition which poses a serious threat or imminent danger to the health or safety of the

-11-

public or Government personnel."  Id. § 52.236-13(d).  If, upon notification, the contractor refuses to take corrective action the contracting officer has the option to stop work until satisfactory corrective action is taken.  Id.  The contracting officer is also required to contact OSHA of instances where the contractor has been notified to take immediate action to correct serious or imminent dangers.  Id. § 36.513(c).

The FAR prescribes broad oversight obligations for the Navy. Specifically, "[c]ontracting officers are responsible for ensuring performance of all necessary actions for effective contracting, ensuring compliance with the terms of the contract, and safeguarding the interests of the United States . . .  In order to perform these responsibilities, contracting officers should be allowed wide latitude to exercise business judgment."  Id. § 1.602-2.  Thus, the FAR explicitly provides a contracting officer with discretion in determining the manner in which the officer will conduct oversight responsibilities.

## B.  The Federal Tort Claims Act

The FTCA is a limited waiver of the federal government's sovereign immunity.  It allows civil actions against the United States "for the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance

with the law of the place where the act or omission occurred."  28

U.S.C. § 1346(b).  Absent this waiver of sovereign immunity, the

federal courts lack subject matter jurisdiction over torts against

the United States.

Congress has specified several circumstances in which the

waiver will not attach.  28 U.S.C. § 2680.  The exception primarily

relied on by the district court relates to the claims "based upon

the exercise or performance or failure to exercise or perform a

discretionary duty . . . whether or not that discretion is abused."

28 U.S.C. § 2680(a).[4]  A line of Supreme Court cases explains the

purpose behind, and the boundaries of, the exception.  See United

States v. Gaubert, 499 U.S. 315 (1991); Berkovitz v. United States,

486 U.S. 531 (1988); United States v. S.A. Emperesa de Viacao Aerea

Rio Grandenese (Varig Airlines), 467 U.S. 797 (1984); Dalehite v.

---

[4]In the alternative, the district court determined that the Navy's
conduct was protected from liability by the independent contractor
exception.  28 U.S.C. § 2671; United States v. Orleans, 425 U.S.
807, 815 (1976).  Pursuant to this theory, the government cannot be
held vicariously liable for the negligence of an independent
contractor unless it supervised the day to day operations of the
contractor. Orleans, 425 U.S. at 815.  Wood attempts to circumvent
this exception by first arguing that the Navy retained close
supervisory control over ASI's work.  We find no evidence in the
record to support this contention. Second, Wood fashions her
argument as one of direct rather than vicarious negligence.  This
argument dovetails with the discretionary function exception in
that if the conduct of the government's employees was
discretionary, it is protected from liability even if negligent.
Berkovitz, 486 U.S. at 539; Dalehite, 346 U.S. at 33; Attallah v.
United States, 955 F.2d 776, 784 n.13 (1st Cir. 1992). As a result,
we will limit our discussion to the discretionary function
exception.

United States, 346 U.S. 15 (1953). The exception exists to protect the "discretion of the executive or administrator to act according to one's judgment of the best course." Dalehite, 346 U.S. at 34, and to prevent "judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy." Varig Airlines, 467 U.S. at 814. By creating an exception for discretionary decisions, Congress intended "to protect the government from liability that would seriously handicap efficient government operations." United States v. Muniz, 374 U.S. 150, 163 (1963).

As the discretionary function jurisprudence has evolved, an analytical framework has developed. We must first identify the conduct that allegedly caused the harm. Gaubert, 499 U.S. at 322. Next, we must determine whether the identified conduct is discretionary. Id. Conduct is non-discretionary only when a "federal statute, regulation or policy specifically prescribes a course of action for an employee to follow." Id. Once the conduct is deemed discretionary, we still must determine if the exercise of that discretion involves, or is at least susceptible to, policy-related judgments. Id. The Gaubert Court directed the lower courts to look first to statutes, regulations and agency guidelines as competent sources for determining established government policy. Id.; see also Irving v. United States, 162 F.3d 154, 165 (1st Cir. 1998) (en banc). We review de novo the lower court's determination

-14-

that the discretionary function exception controls.  <u>Irving</u>, 162 F.3d at 161.

### III.

**A.    Count I**

Wood claims that the Navy was negligent when it selected ASI as the lead abatement and painting contractor.  While Wood concedes that selection of a contractor is a discretionary act, she argues that ASI would never have been chosen if the Navy had not negligently mis-read ASI's so-called experience modification rating ("EMR"), causing it to select "a notoriously unsafe contractor to perform work acknowledged to be highly or ultra dangerous." According to Wood, the calculation of the EMR was non-discretionary and therefore not protected by the exception.

The EMR is a rating used by worker's compensation underwriters to set insurance premiums.  The higher the EMR, the worse the safety record.[5]  At the time the present contract was awarded, the Navy identified ASI's EMR as .47, a rating considered extremely good and admittedly better than the other contract bidders.  According to the affidavit of Robert Flynn, a consultant in workplace safety, it was "extremely unlikely" that ASI had, in fact, an EMR that low.  In his opinion it was more likely 1.47 and

---

[5]According to the information provided by plaintiffs' workplace safety consultant, an EMR range is generally 2.0 or higher for most unsafe employers. For very large companies with an almost perfect safety record the EMR may be as low as .30. The norm for employers engaged in the same type of work as ASI is 1.0.

it could have been as high as 2.87 given ASI's poor safety record on the jobs performed in the past. Flynn stated that ASI had committed multiple OSHA violations and experienced a loss of life prior to the commencement of the 1996 contract.

The government argues that the selection of a contractor is the quintessential discretionary act and that, in this instance, there was no directive to cabin the Navy's discretion. Wood argues that the issue is not the broad discretion in selecting a contractor but the issue to conduct properly a mandatory activity, the consideration of ASI's EMR, and that this failure was causally connected to the selection of ASI. The argument is that, but for the negligent performance of a mandatory duty, ASI would have never been selected. The argument fails for lack of proof. Wood points to no express requirement, to which the Navy was subject, mandating an assessment, whether or not accurate, of a contractor's EMR, or establishing a particular EMR benchmark as a precondition to selection. Nor was there an express requirement that the government disregard or disqualify a contractor based on a contractor's past failure to maintain some particular level of safety compliance on other jobs. In the absence of a particular criterion that the government failed to meet, or a mandated duty it failed to perform, the conduct of a government employee must be deemed discretionary.

Wood counters that even if the assessment of ASI's EMR was discretionary, it was not policy related. Because the law presumes that the exercise of official discretion implicates policy judgments, Wood bears the burden, when making this argument, of demonstrating that the Navy's conduct was not at least susceptible to policy related judgments. Irving, 162 F.3d at 168. Wood contends that the Navy's award of the contract to ASI was based on an erroneous assessment of ASI's EMR. Because the decision was based on a mistake, the Navy never made a conscious, policy-based decision to accept a questionable EMR. In essence, Wood argues, the Navy's selection of ASI was based on error and not on a weighing of competing factors.

But this argument, although made under the rubric of whether the decision was "policy-driven," boils down to little more than a restatement of the same argument we have just rejected above: namely, that the Navy was required to conduct an EMR assessment and that a satisfactorily low EMR was a mandatory requirement, depriving the Navy of overall discretion to select a contractor failing to meet such a criterion. As we have said, the record simply does not support giving such pivotal importance to the EMR. The FAR, the federal procurement regulations, do not refer in any way to an EMR; they clearly mandate nothing in this regard.

The record makes plain that in selecting a contractor, the Navy was required to evaluate and weigh a plethora of factors, using its overall judgment as to the final choice. The Navy's bid application makes safety just one aspect of the selection decision and the EMR rating just one piece of information being sought pertaining to safety. As noted earlier, the Navy evaluated and awarded the project based on proposals submitted by the various bidders. The proposals consisted of both price information and technical data - each weighted equally. Safety was one of four issues addressed in the technical data, and within the safety information provided to the Navy, the EMR was but one of six items.

All of these factors appear to have been considered in the selection of ASI. Marilyn Colot, the Deputy Director of Contracts for the Navy, identified several factors that led to ASI's selection. Specifically, ASI presented a "schedule of work and work force that supported their [sic] ability to both phase and complete the outlined tasks"; it was prepared to do all the work "in-house" with the exception of electrical work; it proposed using employees that "far exceed[ed] the minimum experience qualifications required by the solicitation"; and it presented a "well qualified team of technical personnel" for accomplishment of the project. In addition, the firm's corporate management plan showed that top management personnel would be directly involved in the project. Further, ASI's past performance information

-18-

demonstrated that it had experience in large contracts specializing in painting and lead abatement of bridges and other structures over 500 feet in height. The Navy contacted ASI's previous customers to verify satisfaction and performance. Finally, ASI's proposed safety plan was "by far the best of the proposers," its corporate safety plan was excellent, and its EMR was low.

In sum, the evidence indicates that the Navy's selection of ASI was a discretionary decision grounded in a broadly-based policy judgment that ASI represented the "best value" for the American taxpayer. It is pure speculation that the Navy would have reconsidered its choice of ASI if ASI's EMR had been significantly higher than what the Navy apparently believed it to be. It was certainly not required to do so, nor was it obvious it would have done so. This is exactly the type of decision that Congress intended to protect from judicial second-guessing. Consequently, the Navy's decision to engage ASI is protected by the discretionary function exception.

## B. Counts II & III

Wood contends in Count II that the failure of the Navy to ensure contract compliance with safety requirements creates landowner liability pursuant to Restatement (Second) of Torts §§ 343, 343A. In Count III, Wood alleges that the Navy had a responsibility to supervise carefully an independent supervisor under Restatement (Second) of Torts §§ 413, 414. We pass no

-19-

judgment on whether either theory, if established, would support liability against the Navy. Both theories rely on the premise that the Navy was mandated to supervise closely and to ensure ASI's compliance with its contractual obligations, including all safety requirements. Because the two claims are rooted in the same operative facts, we consider them together.

Wood does not suggest that the Navy failed to perform inspections, nor, for that matter, does she suggest that the Navy violated its explicit obligations under the contract; rather she alleges that the inspections and oversight were inadequate to ensure that ASI was in compliance with the safety requirements. Once again Wood concedes that the Navy's determination of how to ensure ASI's compliance with the contract was discretionary and involved the balancing of competing factors. Wood contends, however, that there was no discretion provided the Navy on whether it ensured that ASI was in compliance with the contract.

Wood relies on a document, prepared by Marilyn Colot, delegating administration of the ASI contract, to support her contention that the Navy had accepted the responsibility to ensure that ASI was following the mandated safety requirements. According to Wood, this document represents the Navy's policy in regards to the Contract and mandates that the naval officers overseeing the project made certain that ASI was in compliance. The document outlines generally the administrative functions to be performed by

-20-

the oversight officer. Included amongst the almost thirty duties was the directive to "ensure contractor compliance with the contractual safety requirements." Pursuant to Wood's theory, this document removes the Navy's conduct from the safe harbor created by the discretionary function exception.

Wood's reliance on Colot's memorandum is misplaced, however. In Irving we addressed, at some length, the source of policy pronouncements and what role that source plays in determining the existence of discretion. 162 F.3d at 165. Congress has the ultimate authority to render a function discretionary or obligatory. Id. (citing Martin v. Occupational Safety and Health Review Comm'n, 499 U.S. 144, 152-53 (1991)). In this case, it delegated that authority to the Administrator, not to Navy officials. Thus, we must look first to the statements of the official policymaker, as set forth in the FAR, to determine the Navy's obligations with respect to ASI's compliance with safety requirements. Gaubert, 499 U.S. at 322.

As noted earlier, the Navy's primary objective under FAR in entering and overseeing the Contract was to obtain the best value for the American taxpayer. While the Navy was required generally to ensure performance of contract terms, the FAR dictates that contracting officers be provided "wide latitude to exercise business judgment" in this endeavor. 48 C.F.R. § 1.602-2. The FAR does not prescribe a course of action the Navy must follow in

-21-

ensuring contractor compliance with contractual safety requirements. Pursuant to the FAR and the mandated contract provisions, the Navy had limited supervisory duties - it needed to review and to approve the safety plan, contact ASI if it noted that it was not in compliance with the contract, and contact OSHA if the Navy notified ASI regarding a serious or imminent danger.

Even if Colot's pronouncement was controlling in this case, it is too general to satisfy the specific prescription requirement set forth in Gaubert and Berkovitz. Shansky, 164 F.3d at 691. Colot's directive is simply a goal that, to attain, required Navy personnel to make discretionary judgments. Contrary to Wood's assertion, Colot's testimony supports this conclusion. When Colot was asked how Lieutenant Schroeder, the navy officer in charge of administration of the Contract, ensured compliance with the safety requirements of the contract she replied: "Well I think that you would have to ask Lieutenant Schroeder that question because that varies widely by activity, by office, by resource, by contract."

The context of the directive also bolsters this conclusion. See id. The statement is embedded in a list of thirty other goals including, but not limited to, that the contracting officer ensure compliance with applicable labor laws; that he ensure compliance with contractual quality assurance requirements; and that he ensure contractor compliance with small disadvantaged

business subcontracting plans. The list, read as a whole, simply echoes the objectives set forth in the FAR, and like the FAR, leaves the implementation of these objectives to the discretion of the contracting officer. The Navy's performance of safety oversight was plainly discretionary, a point that Wood acknowledges.

The Navy's decisions regarding safety oversight also involved the permissible exercise of policy judgment. See Shansky, 164 F.3d at 692; Irving, 162 F.3d at 168. The Supreme Court has stated that "if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves the same policies which led to the promulgation of the regulation." Gaubert, 499 U.S. at 324. For this claim to survive, Wood must allege some facts to support a finding that the contested conduct is not grounded in the policy of the regulatory regime. Id. at 324-25. Wood offers no real challenge to the position that the Navy's actions were policy-driven.

In meeting the objectives of the FAR, the Navy was required to balance a host of competing factors, among them the cost, quality and timeliness of the delivered product as well as the minimization of administrative operating costs. 48 C.F.R. § 1.102-2(a) and (c). Here, the Navy decided the best manner to achieve these sometimes-competing objectives was to conduct brief,

-23-

ground-level inspections several times a week to assess ASI's compliance with the safety requirements of the contract.

Moreover, the policy objectives set forth in the FAR do not show that Congress intended the contracting officer to be responsible ultimately for the safety practices of a contractor. To the contrary, the FAR places primary responsibility for safety on the contractor; a limited supervisory role is given to contracting officers. The delegation of the responsibility for safety issues to the contractor suggests that, in promulgating the FAR, the Administrator had determined already that in obtaining the "best value" for the American taxpayer, worker safety should be a primary concern of the contractor. See Varig Airlines, 467 U.S. at 816.

We disagree with Wood's attempt to equate this case with the Supreme Court's decision in Indian Towing Co. v. United States, 350 U.S. 61 (1955). There, the Coast Guard assumed direct and sole responsibility for the operation of a lighthouse, a charted navigational aid, any failure of which would create unique dangers to shipping. Id. at 62. The light was allowed to go out and a vessel ran aground. Id. The Court held the Coast Guard liable, reasoning that, once it had exercised its discretion to operate the lighthouse, it was obligated to act with reasonable care. Id. at 68. Here, the Navy itself did not assume responsibility for the safety of the contractor's own employees working at the towers but

rather left that responsibility to the contractor, with minimal oversight.

Rather than to <u>Indian Towing</u>, the Navy's decision-making and conduct are better analogized to the Federal Aviation Administration's ("FAA") conduct discussed in <u>Varig Airlines</u>, 467 U.S. at 799. In <u>Varig Airlines</u> the government was facing tort liability for several plane accidents allegedly caused by the FAA's negligence in issuing safety compliance certificates. <u>Id.</u> Pursuant to regulations promulgated by the Secretary of Transportation, the FAA was empowered to enforce compliance with minimum safety standards in aircraft according to its best judgment. <u>Id.</u> at 816. In the exercise of this discretion, the FAA devised a certification process that placed the duty to ensure that an aircraft met with FAA safety regulations in the hands of the manufacturer and operator, while the FAA retained the responsibility for policing compliance. <u>Id.</u> at 817. To meet its responsibility, the FAA devised a "spot-check" system.

The Court held that the implementation and performance of the "spot-check" system "for compliance review is plainly discretionary activity of the 'nature and quality' protected by § 2680(a)." <u>Id.</u> at 819. The Court reasoned that:

> When an agency determines the extent to which it will supervise the safety procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind. Decisions as to the manner of enforcing regulations directly affect the

> feasibility and practicality of the Government's regulatory program; such decisions require the agency to establish priorities for the accomplishment of its policy objectives by balancing the objective sought to be obtained against such practical considerations as staffing and funding.

Id. at 819-20.

Here, the Navy's contracting officer was empowered to enter a contract and to ensure compliance with the contract, including the safety requirements mandated in the FAR and set forth in the contract. Part of ensuring that ASI was in compliance with the safety aspects of the contract, including all applicable safety regulations, was to require that ASI submit a safety plan outlining its program to comply with all safety requirements. Before the contract began, ASI submitted and the Navy approved such a plan. In its safety plan, ASI assured the Navy that ASI's supervisors would "have the responsibility and the absolute authority to enforce [its] job safety program" to "ensure that no laborer or mechanic employed on this project is allowed to work in surroundings or under conditions which are . . . dangerous to his/her health or safety." Prior to Wood's accident, the Navy required that ASI amend the plan to respond to noted safety deficiencies. In terms of ongoing oversight, the Navy implemented a system in which ASI was required to submit daily logs, including accident reports, and the Navy visited the work site two to three

times a week to perform walk-through inspections to identify possible safety violations.

In this instance, the statutory and regulatory scheme provides the Navy broad discretion to balance a number of competing factors in making its supervisory decisions. Varig Airlines, 467 U.S. at 814; Shansky, 164 F.3d at 693; Mercado Del Valle v. United States, 856 F.2d 406, 409 (1st Cir. 1988). There is nothing in the record to suggest that the Navy's discretionary decision regarding the implementation and administration of a supervisory system was anything other than policy-driven. Decisions regarding the exercise of supervisory authority are traditionally the sort the discretionary function exception was designed to encompass. See Attallah v. United States, 955 F.2d 776, 784 (1st Cir. 1992) (ruling extent Custom service supervises employees protected by the discretionary function exception); Mercado Del Valle, 856 F.2d at 409 (concluding that Air Force's supervision of student military organization discretionary); Andrews v. United States, 121 F.3d 1430, 1441 (11th Cir. 1997) (holding Navy's supervision of contractor's adherence to waste disposal safety regulations encompassed by discretionary function exception); Domme v. United States, 61 F.3d 787, 792-93 (10th Cir. 1995) (ruling that Department of Energy's supervision of contractor's compliance with applicable safety regulations protected by exception); Kirchmann v. United States, 8 F.3d 1273, 1277 (8th Cir. 1993) (concluding Air

-27-

Force's supervision of contractor's disposal of TCE protected by exception).

Because the Navy's conduct is protected by the discretionary function exception, the United States has not waived its sovereign immunity. Consequently, there is no subject matter jurisdiction.

**AFFIRMED**.