# United States Court of Appeals

## For the First Circuit

No. 02-1454

LIMAR SHIPPING LTD. AND OMI CORP.,

Plaintiffs, Appellants,

v.

UNITED STATES OF AMERICA,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Morris E. Lasker, U.S. District Judge]

Before

Torruella, Circuit Judge,

Stahl, Senior Circuit Judge,

and Howard, Circuit Judge.

Thomas E. Clinton, with whom Robert E. Collins and Clinton &
Muzyka, P.C., were on brief, for appellants.
Michelle T. Delemarre, Admiralty Trial Attorney, with whom
Robert D. McCallum, Jr., Assistant Attorney General, and Michael J.
Sullivan, United States Attorney, were on brief, for appellee.

March 25, 2003

**TORRUELLA**, **Circuit Judge**.  Limar Shipping Ltd. ("Limar") and OMI Corporation ("OMI"), plaintiffs-appellants, appeal a grant of summary judgment in favor of the defendant-appellee the United States, in a case alleging, inter alia, that the United States was negligent and/or breached warranties in the surveying of the Boston Harbor and the dissemination of nautical charts that failed to accurately depict the depth of the harbor.  Plaintiffs claim that the erroneous chart resulted in the grounding of and subsequent damage to their vessel, the M/T Limar.  Plaintiffs raise two main issues on appeal, namely, that the district court erred in: (1) finding that there is an implied discretionary function exemption in the Suits in Admiralty Act;  and (2) applying the discretionary function exemption as it did to the facts of this case.  After careful review, we affirm the district court's ruling for the reasons stated below.

## I.  Facts

On the morning of March 11, 1996, the steel hulled tanker vessel M/T Limar, owned by Limar and operated by OMI, approached Boston, Massachusetts.  Under Massachusetts law, foreign vessels the size of the M/T Limar must employ a harbor pilot when entering Boston Harbor.[1]  See Mass. Gen. Laws ch. 103, §§ 21, 28.  Accordingly, the M/T Limar took aboard a harbor pilot, Lawrence

---

[1]  The M/T Limar measured over 545 feet in length and had a beam of approximately ninety feet.  The M/T Limar's draft was thirty-three feet, nine inches.

-2-

Cannon, who undertook navigation of the ship through the Boston Harbor shipping channel.

The main shipping route in the Boston Harbor includes side-by-side inbound and outbound channels, which are maintained by the Army Corps of Engineers ("Army Corps"). Congress allocates funds to maintain federal shipping channels at certain authorized depths and widths. In 1996, the Army Corps was authorized to dredge the Boston Harbor inbound channel to a depth of thirty-five feet below Mean Low Water, and was also authorized to maintain the outbound channel at a depth of not more than forty feet. Both of these channels could be maintained up to 600 feet wide.

The Army Corps conducts periodic surveys of the shipping channels to determine their actual depths, as opposed to the authorized depths, and to discover any unexpected debris or shoaling. The results of these surveys are made known to the public through Results of Survey Reports and the Coast Guard's Local Notice to Mariners publications. Relevant to this matter, the last periodic survey of the disputed area of the inbound channel was completed in 1990. The results of the 1990 Boston Harbor survey appeared in a Results of Survey Report dated July 23, 1990, and they were published in the First Coast Guard District's Local Notice to Mariners, Number 31, on August 1, 1990. They also appeared in a book entitled The Port of Boston, Massachusetts, Port Series No. 3, issued in 1994. In each of these sources, the 1990

-3-

survey reported the controlling depth of the channel, which is the shallowest point at any place as compared to Mean Low Water.

Cannon, a harbor pilot with twenty-four years of experience at the time of the grounding, knew these survey results, and did not bring a nautical chart with him. Although he had never been aboard the M/T Limar, he familiarized himself with the ship, and asked the M/T Limar's crew for the draft of the ship before directing the ship through Boston Harbor.

While Cannon piloted the vessel, the M/T Limar's crew observed the movement of the ship. Third Mate Rodolfo Arcilla took periodic position fixes of the vessel's location and plotted them on the M/T Limar's copy of Nautical Chart 13272, 43d Edition, dated June 28, 1995. The National Oceanic and Atmospheric Administration ("NOAA") created this chart using information from several sources, including the 1990 Army Corps survey mentioned above.[2]

At 8:50 a.m., the M/T Limar scraped the Boston Harbor floor near Red Nunn Buoy No. 8, at approximately 42 20.494' N and 71 00.505' W. According to the nautical chart produced by NOAA, the water depths nearest to the position of the groundings are thirty-five and thirty-six feet, which allegedly should have accommodated the M/T Limar's thirty-three feet, nine inch draft.

_____

[2] The nautical chart contains a warning that states "[t]he prudent mariner will not rely solely on any single aid to navigation." In addition, the chart includes several cautions, including one that the "[t]emporary changes or defects in aids to navigation are not indicated on this chart. See Notice to Mariners."

The vessel grounded on the starboard (right) side forebody, but was still able to reach its berth. However, the damage to the hull and the ensuing steps taken to prevent oil pollution are alleged to have cost Limar and OMI in excess of $800,000.

Limar and OMI sued the government under the Suits in Admiralty Act ("SAA"), 46 U.S.C. Appx. §§ 741-52 (1976), alleging that the misrepresentation of the water depth on the chart caused the damage to the M/T Limar. The district court granted summary judgment in favor of the United States, finding that the discretionary function exception applied and that the United States was entitled to dismissal of the complaint on grounds of sovereign immunity.

## II.  Standard of Review

This Court reviews the grant of a summary judgment motion de novo, considering all facts in the light most favorable to the non-moving party, in this case the plaintiffs. Gu v. Boston Police Dept., et al., 312 F.3d 6, 10 (1st Cir. 2002).

## III.  Discussion

This case involves allegations of negligence on the part of the United States in the production and dissemination of a nautical chart. In order to avoid confusion, we highlight several key facts. The Army Corps conducted a survey of the Boston Harbor, which was later used by NOAA to create a nautical chart of the harbor. The plaintiffs argue that the chart failed to accurately

depict the depth of the harbor, and the M/T Limar's grounding was a result of this inaccuracy. Instead of following what the plaintiffs allege are mandatory standards, the Army Corps followed its own guidelines in conducting the survey. The plaintiffs contend that the chart's inaccuracy could have been prevented if NOAA had based the chart on a survey that was conducted in accordance with NOAA's standards for hydrographic surveys. Specifically, the plaintiffs argue that if the nautical chart had been based on a survey conducted in compliance with NOAA guidelines, it would have been more accurate because those guidelines require measurements on tighter sounding intervals and line spacing than those called for by the Army Corps guidelines. According to the plaintiffs, the Army Corps should have followed the NOAA requirements in conducting its initial survey because it knew that NOAA would rely on the survey in creating nautical charts. NOAA did in fact use the Army Corps survey, in conjunction with other sources, to create the chart. Thus, plaintiffs allege two grounds of liability: (1) the Army Corps decision to follow its own guidelines rather than the NOAA guidelines in conducting the survey; and (2) NOAA's decision to create a chart based on that survey.

Plaintiffs urge us to hold that the United States has completely waived sovereign immunity in the SAA, and consequently that no discretionary function exception exists in this context. In the event we find that there is such an exception, plaintiffs

argue that the exception should not apply to the decisions made by the Army Corps and NOAA, and that the United States should be subject to suit, because the decisions were non-discretionary. The final argument offered by plaintiffs is that even if NOAA's decision to rely on the Army Corps survey was a discretionary decision, once that decision was made, the government entity had a duty of care to create the chart accurately. Plaintiffs argue that since mariners regularly rely on such charts for navigation, misrepresentation as to the depth of the harbor is grounds for liability.

In response, defendants argue that the actions by both the Army Corps and NOAA are discretionary decisions that fall within the implied discretionary function exception to the SAA. Thus, defendants argue the United States is protected from suit by sovereign immunity.

## A. Existence of the Implied Discretionary Function Exception

We begin with the threshold issue of whether a discretionary function exception should be implied in the context of the SAA. Unless such an exception can be implied, waiver of sovereign immunity by the United States would allow the plaintiffs' suit to proceed.

The United States, as sovereign, is immune from suit unless it waives its sovereign immunity and consents to be sued. See, e.g., United States v. Thompson, 98 U.S. 486, 489 (1878).

Absent express waiver of sovereign immunity, federal courts lack subject matter jurisdiction over suits against the United States. United States v. Sherwood, 312 U.S. 584, 586 (1941).  In the SAA, the United States waives its sovereign immunity from suit for maritime torts committed by its agents.  See 46 U.S.C. Appx. § 742; Gercey v. United States, 540 F.2d 536, 539 (1st Cir. 1976).

The SAA contains no express exceptions to the waiver of sovereign immunity.  In contrast, the Federal Torts Claims Act ("FTCA"), 28 U.S.C. § 1346(b), which waives sovereign immunity for tort claims against the United States, contains an express exception to shield the "discretion of the executive or administrator to act according to one's judgment of the best course." Dalehite v. United States, 346 U.S. 15, 34 (1953).  This discretionary function exception serves to prevent "judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy." United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 814 (1984).  This Court has held that a similar

discretionary function exception is to be implied into the SAA.[3] See Gercey, 540 F.2d at 539.

We decline plaintiffs' invitation to reconsider our decision in Gercey, and reaffirm the principles set forth therein. Congress did not intend, by passing the SAA, to create a system wherein all administrative decisions concerning maritime matters are second-guessed and subject to judicial review. Gercey, 540 F.2d at 539. Absence of an "express Congressional directive to the contrary" will not be read as a green light for federal courts to

---

[3] In Gercey, this court held that

> the [SAA] does not contain an express exemption for harm caused by the exercise of "discretionary functions", a category which includes, and probably should be limited to, basic "policy judgments as to the public interest." Although the [SAA] contains no express exception, we think that sound principles demand that the act be construed as subject to such discretionary function exception. Were there no such immunity for basic policy making decisions, all administrative and legislative decisions concerning the public interest in maritime matters would be subject to independent judicial review in the not unlikely event that the implementation of those policy judgments were to cause private injuries.

Id. at 539 (emphasis added) (citations and footnote omitted). The other circuit courts that have considered this issue have also concluded that the "SAA's waiver of immunity is subject to the discretionary function exception." Mid-South Holding Co., Inc. v. United States, 225 F.3d 1201, 1204 (11th Cir. 2000) (citing Tew v. United States, 86 F.3d 1003, 1005 (10th Cir. 1996) (providing case law from ten different circuits, including this one, supporting the existence of an implied discretionary function in the SAA)). Plaintiffs point to Lane v. United States, 529 F.2d 175 (4th Cir. 1975), in support of their argument that the discretionary function exception does not apply in the SAA context. The Fourth Circuit, however, now agrees that the exception should be read into the SAA. Tiffany v. United States, 931 F.2d 271, 277 (4th Cir. 1991).

assume power to review "all administrative and legislative decisions concerning the public interest in maritime matters." Id. The district court did not err in applying well-established law implying a discretionary function exception to the SAA.

**B. Applicability of the Implied Discretionary Function Exception**

Given that there is an implied discretionary function exception to the SAA, we turn to the argument that the district court misapplied the exception to the facts of the case at bar. As in the FTCA context, the implied discretionary function exception to the SAA "insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment." Berkovitz v. United States, 486 U.S. 531, 537 (1988). Plaintiffs suggest that the actions of the Army Corps and NOAA fail to meet the discretionary function exception's applicability test and that the United States is therefore subject to suit.

In Berkovitz, the Supreme Court set forth a two-part test to determine whether the discretionary function exception bars a suit against the United States.[4]  486 U.S. at 535-37.  First, a

---

[4]  In Berkovitz, the Supreme Court was specifically addressing the discretionary function exception to the FTCA. 486 U.S. at 533. We hold that the Berkovitz test applies in cases involving the implied discretionary function exception to the SAA. Other courts have applied the Berkovitz test when analyzing the issue of the applicability of the discretionary function exception in a suit brought under the SAA. See, e.g., Theriot v. U.S., 245 F.3d 388, 397 (5th Cir. 1998); Cassens v. St. Louis River Cruise Lines, Inc., 44 F.3d 508, 511-14 (7th Cir. 1995).  Furthermore, there is evidence on the record that both parties agreed that if the discretionary function exception applies, it is subject to the

-10-

court must determine if the challenged conduct involves an element of judgment, meaning that "the action is a matter of choice for the acting employee." Id. at 536. Second, "a court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield," meaning it involved "governmental actions and decisions based on considerations of public policy." Id.

## 1. Applicability of the Discretionary Function Exception to the Army Corps' Survey

It is well established that "the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." See Berkovitz, 486 U.S. at 536. However, if there is no mandatory regulation that requires a particular course of action, then the discretionary function exception can apply. Id. Here, plaintiffs argue that the Army Corps failed to follow mandatory internal procedures requiring its survey of the Boston Harbor to be conducted in accordance with NOAA guidelines. Because they contend that compliance with the NOAA guidelines was mandatory, plaintiffs claim that the discretionary function exception cannot protect the United States from suit. We disagree.

No mandatory internal procedures or directives required the Army Corps to adhere to the NOAA guidelines in conducting its

---

analysis of the Berkovitz test.

-11-

survey of the Boston Harbor, thus the "element of judgment" prong of the <u>Berkovitz</u> test is met. The Army Corps generally follows its own manual when it performs oceanic surveys, and there is no dispute that the Army Corps' <u>Hydrographic Surveying: Engineer Manual</u> (1994) ("<u>Army Corps Manual</u>") applies to hydrographic surveys planned and performed by the Army Corps and sets forth the applicable procedures. <u>Army Corps Manual</u> at 1-4 (stating that "manual establishes standard procedures, minimum accuracy requirements, instrumentation and equipment requirements, and quality control criteria for hydrographic surveys"). The <u>Army Corps Manual</u> states:

> This manual is intended to cover only those engineering and construction survey activities which support typical river, harbor, harbor approach channel, or inland waterway projects. . . . [it] does not cover classical hydrographic surveying functions which are more traditionally associated with the preparation of nautical charts. These procedures are detailed in the [NOAA <u>Hydrographic Manual</u>].

<u>Army Corps Manual</u> at 1-4(b). Here, the parties agreed and the district court found that the Army Corps conducted the Boston Harbor survey as a "condition survey," which is a periodic survey carried out "to determine the present condition of navigation channels [and] underwater features, but is not a survey in conjunction with the preparation of a nautical chart." <u>Army Corps Manual</u> at 2-10. There is no mandatory language in the <u>Army Corps Manual</u> indicating that the Army Corps must follow the NOAA

guidelines when carrying out a condition survey, even if it is aware that such a survey may be used by other agencies to prepare nautical charts -- what matters is the purpose of the survey at the time it is conducted by the Army Corps.[5] Since the purpose of the survey at the time it was conducted was to determine the condition of the harbor rather than to chart its depth, the Army Corps was under no obligation to comply with NOAA guidelines.

Having found that the choice to conduct the condition survey according to the Army Corps guidelines constituted a discretionary choice, we now turn to the second part of the Berkovitz test and consider whether that decision is of the type the discretionary function exception was designed to protect. Berkovitz, 486 U.S. at 537.

Where "a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations."[6] United States v. Gaubert, 499 U.S. 315, 347

---

[5] Plaintiffs argue that the purpose of the 1990 survey is a disputed issue of material fact. As we stated above, however, both parties conceded the survey was indeed a condition survey and thus not a survey conducted for the purpose of creating a nautical chart.

[6] The fact that we are concerned here with internal procedures and guidelines, as embodied in the Army Corps Manual, rather than with federal statutes or regulations does not change our analysis. The Gaubert presumption applies to internal procedures:

(1991). Plaintiff bears the burden of rebutting this presumption and demonstrating that the conduct at issue is not policy-based. See Wood v. United States, 290 F.3d 29, 37 (1st Cir. 2002). Here, the plaintiffs fail to meet this burden. Indeed the Corps' decision to follow its own less stringent guidelines is most likely a choice aimed to maximize efficient use of resources, and is thus policy-based. See, e.g., Varig Airlines, 467 U.S. at 820 (recognizing the efficient allocation of agency resources as a policy choice).

## 2. Applicability of the Discretionary Function Exception to NOAA's use of the Army Corps Survey in Creating the Chart

This leaves only the argument that once NOAA made the decision to create a chart, it had a duty to produce it accurately.[7] In Indian Towing Co. v. United States, 350 U.S. 61

---

Not all agencies issue comprehensive regulations, however. Some establish policy on a case-by-case basis, whether through adjudicatory proceedings or through administration of agency programs. Others promulgate regulations on some topics, but not on others. In addition, an agency may rely on internal guidelines rather than on published regulations. . . . When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion.

Gaubert, 499 U.S. at 324.

[7] The argument depends on the assumption that the chart would have been accurate had it been based on a survey conducted under the more stringent NOAA standards. It is unclear to us that this argument was presented by appellants on appeal, but we will assume arguendo that it remains a viable argument.

(1955), the Supreme Court held the United States liable for negligently maintaining a lighthouse built by the Coast Guard. Id. at 69. Mariners relied on the lighthouse for navigation and plaintiff's ship was damaged when it ran aground because the light went out. Id. at 62. The Indian Towing Court indicated that once the Coast Guard exercised its discretion to operate the lighthouse, it was under an obligation to do so with reasonable care. Id. at 68. We find that Indian Towing can be distinguished from the instant case because there the government conceded that the discretionary function exception did not apply. Id. at 64. In this case, however, the government vigorously argues, and we agree, that the decision by NOAA to use the Corps' data to create the chart was discretionary and was thus the type of decision the discretionary function exception was meant to protect.[8]

The "element of judgment" prong of the Berkovitz test is satisfied because NOAA's decision to use the Army Corps survey in fact contains an element of judgment. As stated above, the discretionary function applies unless a "federal statute, regulation or policy specifically prescribes a course of action for an employee to follow." Berkovitz, 486 U.S. at 537; accord Wood,

---

[8] Appellants have not challenged NOAA's actual use of the Corps' data as negligent, but rather have chosen to challenge NOAA's decision to use the Corps' data to create the nautical chart. Indian Towing would only apply in the former case, where once NOAA exercised its discretion to use the Corps' data it had to do so in a non-negligent manner.

-15-

290 F.3d at 36. Nowhere in NOAA's Hydrographic Manual are employees directed to use as the basis for charts only surveys conducted by NOAA or by other entities following NOAA's guidelines.  In fact, the manual only stipulates that if NOAA itself conducts a survey, it must conform with the manual's specific directives.  Here, NOAA did not conduct the 1990 survey of the Boston Harbor which formed the basis for the chart.  Since there is no specific regulation, and thus no mandatory language either (1) directing the cartographer as to the surveys that ought to be used when making a chart, or (2) prohibiting use of non-NOAA conforming surveys in creation of a chart, it was within the cartographer's discretion to use the survey made by the Army Corps. See Baird v. United States, 653 F.2d 437, 441 (10th Cir. 1981).

Plaintiffs cite In re Glacier Bay, 71 F.3d 1447 (9th Cir. 1995) in support of their argument that the discretionary function does not apply here because NOAA did not follow mandatory procedures regarding hydrographic surveys.  Glacier Bay involved the grounding of a vessel on a rock that was omitted from the nautical chart.  Id. at 1449-50.  In that case, the Ninth Circuit allowed a negligence suit against the government to proceed because NOAA did not comply with its internal guidelines in conducting the survey for the chart.  See id. at 1453 (holding that the "general grant of discretion was superseded by mandatory requirements" and thus "the discretionary exception function [sic] does not apply").

The Glacier Bay case dealt with surveys conducted by NOAA hydrographers for the purpose of preparing nautical charts. Id. at 1450. Glacier Bay is inapposite, however, because this case deals with NOAA's decision to use an Army Corps condition survey for the preparation of a chart rather than with NOAA's failure to follow its own procedures in conducting an independent hydrographic survey.

The second requirement of the Berkovitz test, that the judgment is the type the discretionary function was designed to protect, is also satisfied with respect to NOAA's decision. The allocation of resources for the production and dissemination of ocean charts by a budget-constrained entity like NOAA is a policy decision that falls within the ambit of the discretionary function exception. Allocation of resources and budget management involve prioritizing and are quintessentially policy-based choices. See Varig Airlines, 467 U.S. at 820; Weissich v. United States, 4 F.3d 810, 813 (9th Cir. 1993) (finding budget and personnel allocation decisions fall within discretionary function exception); Chute v. United States, 610 F.2d 7, 12 (1st Cir. 1979) (indicating the allocation of resources among competing priorities is a policy function). If this Court were to agree with plaintiffs, we would be second-guessing NOAA's policy decision and would be going against the clear intent of the implied discretionary function exception, which is "to prevent judicial second-guessing of

-17-

legislative and administrative decisions grounded in social, economic, and political policy." Berkovitz, 486 U.S. at 536-37 (quoting Varig Airlines, 467 U.S. at 814).

Because NOAA's decision to rely on the Army Corps' survey for the creation of its chart was a policy-based discretionary decision, the discretionary function exception applies. Given the applicability of the discretionary function exception to both the Army Corps and NOAA decisions, we find that the United States has not waived sovereign immunity and cannot be subjected to suit in this matter. See Wood, 290 F.3d at 33-34.

Even if the decision to use the Corps' survey is not protected by the discretionary function exception, we find that no liability attaches here. Indian Towing does not stand for the proposition that once the United States undertakes a function, such as production of a nautical chart, "the most effective and best means must always be selected." Chute, 610 F.2d at 17. Instead, the general principle gleaned from Indian Towing is that "the government must not mislead, and must not induce reliance upon a belief that it is providing something which, in fact, it is not providing." United States v. Sandra & Dennis Fishing Corp., 372 F.2d 189, 195 (1st Cir. 1967).

Here, the government cannot be held liable under the principles established by Indian Towing, because (1) it is unreasonable for mariners to rely solely on the chart; and (2) in

-18-

the alternative, the government did not create the danger in the Boston Harbor. In order for Indian Towing to apply, the chart would need to induce reasonable reliance on the part of mariners. See Whitney Steamship Co. v. United States, 747 F.2d 69, 78 (2d Cir. 1984) (Tenney, J., dissenting) (arguing that Indian Towing applies only where reliance is reasonable). Given the constant possibility that silting or other events may alter the depth of the harbor at any given point, reliance on a year-old chart was unreasonable. Further, the state law requirement that foreign vessels employ a special harbor pilot in the Boston Harbor suggests that at least the Massachusetts legislature believed that reliance on the accuracy of a chart is unreasonable. Were such reliance reasonable, then nautical charts alone would be sufficient for navigation, and presumably a mariner inexperienced with the Boston Harbor would be able to maneuver a vessel safely through its waters by simply using a chart.

Even if there were no statutory requirement for an experienced harbor pilot, the prudent mariner does not rely on charts alone when navigating a body of water. See, e.g., Sheridan Transp. Co. v. United States, 897 F.2d 795, 798 (5th Cir. 1990) ("aids to navigation do not exist in a vacuum and there are various documents which a mariner must use to determine whether he is justified in relying on an aid"); Tidewater Marine, Inc. v. Sanco Int'l, Inc., 113 F. Supp. 2d 987, 997 (E.D. La. 2000) ("Buoys,

radar, Loran, charts, Notices to Mariners, and lookouts are all aids to navigation. None of these alone can be considered absolute indicators of sea conditions."). Here, the chart itself contained prominent warnings that mariners should look to other sources for up-to-date information about the harbor. Because a mariner cannot reasonably rely solely on a chart, nautical charts do not induce reliance such that the government has a duty to ensure their accuracy, especially where the government specifically directs mariners to other publications through warnings or cautions on the chart itself.[9]

---

[9] The Fifth Circuit takes a different position:

> [Nautical charts] are not just casual publications which may be of interest to or fall into the hands of an indeterminate number of users. These charts are published by the Government with the certain knowledge that they (i) will be disseminated through reliable channels to ships and crews and (ii) will be relied on as accurate portrayals of the waters covered. Indeed, this expectation is mandated as a rule of prudent conduct on the part of shipowners. Sailing without a chart or with an obsolete one ranks as more than a mere indiscretion. Many Courts have found such ships to be unseaworthy. Others have found mariners who follow such practice guilty of "glaring" or "gross" fault.

> What the maritime law exacts of shipowner through decisions of admiralty courts may hardly be ignored by the Executive Agency responsible for such charts. The Government must therefore bear the burden of using due care in the preparation and dissemination of such charts and notices.

De Bardeleben Marine Corp. v. United States, 451 F.2d 140, 148-49 (5th Cir. 1971) (footnotes omitted). While the Fifth Circuit believes the government has a duty to produce charts with due care, it goes on to say that "the Government's obligation ceases at that

Where the government does not create a danger but rather only fails to "render adequate performance," liability does not attach. Brown v. United States, 790 F.2d 199 (1st Cir. 1986) (distinguishing Indian Towing, where "the government created a danger by representing that an operating lighthouse was present" from cases where the government does not itself create the danger, as in the case where the government issues weather advisories but does not control the weather). Here, the government did not create the dangers of the Boston Harbor, but merely undertook to produce a chart depicting the depths of the harbor.

### IV. Conclusion

For the above-stated reasons, this Court affirms the judgment of the lower court.

**Affirmed**.

---

time in which a prudent shipowner-navigator would have reasonably received the Notice to Mariner." Id. at 149. We believe an adequate warning, such as a Notice to Mariners, regarding possible inaccuracies in a chart "may absolve the [government] of liability" because "the navigator would no longer be entitled to rely on the [navigational] aid." Whitney Steamship, 747 F.2d, at 78 (Tenney, J., dissenting). Thus, where, as here, mariners are warned to look to recent Notices to Mariners for the latest information regarding a waterway, the due care obligation is met.

-21-